IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:05-CR-129-A |
| | ) | [WO] |
| TERESO RODRIQUEZ-LOPEZ | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Tereso Rodriguez-Lopez ("Rodriguez-Lopez"), a Hispanic male, is indicted under 21 U.S.C. § 841(a)(1) for possessing with intent to distribute five kilograms or more of cocaine. His suppression motion challenges admissibility of the evidence seized from a state trooper's warrantless stop and search of his car on an interstate highway and also attributes to the trooper an impermissible "racial profiling" motivation. Following an evidentiary hearing and due consideration of all submissions, the Magistrate Judge RECOMMENDS denial of the *Motion to Suppress Stop, Searches and Seizures* (Doc. 23, July 5, 2005).

**I.  FACTUAL FINDINGS**

The traffic stop occurred shortly after 4:00 p.m. on April 19, 2005, near Hope Hull, in Montgomery County, on Interstate 85. While monitoring traffic from his car facing southbound traffic, Alabama State Trooper Jessie Peoples ("Peoples") made a rear-view observation of a car speeding northbound and after confirming a 68 mph rate in a 50 mph zone, he "pulled out of the median and pursued and turned on ...emergency lights and stopped" the car, then identifiable as a 1994 Ford Crown Victoria with a Texas tag and tinted windows.[1]  Video and audio-recording

---

[1] Peoples activated the rear antenna of his Stalkar, dual antenna radar. A "void in traffic" permitted him to "observe[] approximately a tenth and a half to maybe two-tenths of a mile a car from the rear exceeding the posted speed limit of 50." Once the car passed, Peoples "switched to the front antenna" and clocked the same 68 mph speed. (*Tr.* at 23).

equipment mounted inside the trooper's vehicle captured most of People's queries clearly but not the responses once Rodriguez-Lopez, the sole occupant, drove his car onto the shoulder of the highway.[2]

Trooper Peoples approached at the passenger side of the car, requested the driver's license and as he examined the Texas license, he related the purpose of the stop:

    TR:   Mr. Rodriguez, you're running 68 in a 50.
    DF:   50?
    TR:   Yeah, any reason?
    TR:    Is this your car?
    DF:    It's my friend's.
    TR:   You got the papers?[3]

Before Rodriguez-Lopez opened the glove compartment to retrieve registration papers, Peoples took note of one cell phone clipped on the visor, another in the passenger's seat and a Red Bull energy drink in the cup holder. Once Rodriguez-Lopez opened the glove compartment, Peoples saw inside "a box of Vivarin energy pills." The trooper ended this initial encounter lasting just over a minute by having Rodriguez-Lopez exit his car (*Ex.1*, 15:06:38) and sit in the front of his patrol car for the trooper's contact with customs officials "to check for license validation, criminal history,

---

[2] Admitted in videotape (*Gov't Ex. 1*) and DVD (*Def. Ex. 1B*) formats, the recording is herein referenced as *Ex. 1*. While the video camera focused on the defendant's car, the audio is only intermittent, apparently reflecting manual de-activations of the equipment. The tape displays the date, 4-19-05, and an initial time, 15:05:17; as the digitally displayed time elapses in seconds, the court is able to calculate a duration of 69 seconds for the first conversation between trooper and motorist [15:05:36 to 15:06:45] and a total time of slightly over an hour for the one-sided tape, commencing from the 15.05.36 initiation of conversation to the ending display of 16:07:26.

[3] While the trooper's initial query (*Ex. 1,* 15:05:36) and subsequent questions recorded clearly, the driver's responses lack similar clarity. Requested to explain his speeding, Rodriguez-Lopez replied that he "did not understand too much." (*Tr*. at 27). For the evidentiary hearing the court utilized certified interpreters in the Spanish language.

2

vehicle registration, border crossings on the vehicle, and any ...warrants on the person or the car."[4]

As he established contact with customs via his cell phone, Peoples ascertained from Rodriguez-Lopez the car's owner, Leon Moreno, as well as his destination to Atlanta for the purchase of a pick-up truck from another friend. He then reported, in part, to the dispatcher: "Hey, [???] stop....I-65 northbound...Montgomery... Houston to Atlanta", pausing to confirm with Rodriguez-Lopez the accuracy of his reported destination, before spelling for the dispatcher his name, providing numbers for his driver's license, the Texas tag, and his cell phone number for a return call.[5] While waiting for the requested checks, Peoples chatted with Rodriguez-Lopez for almost four minutes, posing these queries:

> You're going to pick up a truck?
> *
> What kind of truck?
> *
> You going to buy it?
> *
> Do what now?
> *
> You are going to go pick up a truck? Whatcha gon' [sic] do with that car?
> DF: Ughhhh....pull it.
> You going to pull it?
> *
> Is that ...what do you do for a living? What kind of work?
> *
> You (???)... houses?
> Who bought this truck. The truck you are going to get..did you buy it?
> *
> How do you say that...Tereso?

---

[4]*Tr.* 30.

[5]*Ex. 1*, 15:07:05 - 15:09:20; *Tr.* 30:23 - 31:18.

    \*
    Here's paper, read it.
    How are you going to find this truck in Atlanta?
    \*
    It's at his house?
    \*
    Alright, do you know where his house is?
    \*
    You are going to meet him at a house or a hotel?
    \*
    Where did you pick that car up?
    \*
    Was it at Leon's house or somewhere?
    \*
    Do you have the insurance papers. Are they in the glove box?
    \*
    Can I get it?
    \*
    Can I go look for it?
    \*[6]

With alleged consent from Rodriguez Lopez, Trooper Peoples returned to the Crown Victoria, opened the front passenger door (*Ex. 1,* 15:13:13) and leaned inside to search the glove compartment and the visor for insurance documents. Barely a minute later Peoples closed the car door and headed back to his patrol car; he asked Rodriguez-Lopez about the seller of the pick-up truck as well as the Georgia warning ticket – issued to him in July 2004 – seen by Peoples when he made his fruitless search for insurance documents inside the glove compartment.[7]

Within half a minute Peoples received the expected call from customs – about seven or eight minutes after his call – and talked for not quite a minute. (*Ex. 1*, 15:14:30 - 15:15:22). The female

---

[6]*Ex. 1*, 15:09:22 - 15:13:05. The responses by Rodriguez-Lopez (\*) simply cannot be understood from the audiotape. According to Peoples, Rodriguez-Lopez reported his planned travel on I-20 to Exit 6 for the purchase of a 1997 pick-up at a friend's house, and he consented for Peoples to secure insurance documents from his car. (*Tr.* 32-33).

[7]*Ex. 1*, at 15:14:07; *Tr.* 33-34.

caller's report is inaudible, but Peoples testified that she reported a valid license for Rodriguez-Lopez and a border crossing on the car at Laredo, Texas on April 17, just two days prior to the stop. Having already written a warning ticket, while still conversing with customs, Peoples "reached over and handed it [to Rodriguez-Lopez] and pointed, and he signed it." Three seconds after concluding the phone conversation, Peoples advised Rodriguez-Lopez, "this is a warning, OK"; because his "suspicion level was raised at that point [based] on what [he] had observed and the information" reported by customs, Peoples immediately resumed another round of questions lasting roughly four minutes, and the responses can be deciphered only occasionally:

> TR: Hey. ....how long have you had that car? When did you pick it up?
> DF: This morning
> TR: This morning? Who had it before you before then?
>   Who had it...I mean, you picked it up, right, from Leon; why does it have a ticket to you in the glove box?
> \*
> TR: No, you got one in Georgia.
> \*
> TR: I will show you in a minute.
>   Do you live near Leon?
>   When is the last time you been to Mexico?
> DF: Me?
> TR: Yeah.
> \*
> TR: Did you take that car?
> \*
> TR When's the last time Leon went?
> DF: I don't know.
> TR: You don't know.
>   Why didn't you bring your truck up here? Why didn't you bring your truck to Georgia? Why are you driving Leon's car and not your truck?
> DF: Oh...because... it don't get much gas.
> TR: It doesn't get much gas?
> DF: Yeah.
> TR: What kind of truck is it?
> \*

5

  TR: You are not transporting anything illegal, are you?[8]

 Peoples inquired in Spanish if Rodriguez-Lopez transported drugs in the car and "for permission to search the car," clarifying the latter inquiry by adding "si" for "yes". Acting on Rodriguez-Lopez's "si" reply, Peoples secured written consent:

> I filled out our DPS consent-to-search form in Spanish. I asked Mr. Moreno (sic) to read it. And in the beginning, he attempted to sign it; and I told him, no, you need to read it. And I asked him to read the top line out loud, and he – and he complied. And then he appeared to read the rest of the form, and he signed it.[9]

 Peoples promptly began searching inside the Crown Victoria, its trunk, under the rear-end and hood before being joined about seven minutes later by a second trooper (*Ex. 1*, at 15:26:36) and continuing the search to 15:33:45. When Peoples returned to the patrol car, he reported to Rodriguez-Lopez the smell of cocaine inside his car. About six seconds later the videotape depicts the first viewing of a canine making his exterior sniff around the car for about a minute (*Ex. 1*, 15:34:45 -15:35:46). Peoples then related his suspicion that the car contained a load of cocaine to other law enforcement officers and secured help to impound and search the car. After these communications, Peoples read to Rodriguez-Lopez in English his *Miranda* rights, inquiring intermittently in Spanish if he understood the rights explained. Officers continued a vehicular search at the scene, targeting the windshield identified by Peoples, before the videotape ends about half an hour later.[10]

---

  [8]*Ex.1*, 15:15:28 -15:18 :09. Based on Peoples' testimony, Rodriguez-Lopez responded, in part, that he had picked up Moreno's car that morning, that he traveled to Mexico "because his wife was sick" two weeks previously, "and then he changed it to a week." (*Tr.* 36).

  [9]*Ex. 1*, 15:15:28 - 15:19:08; *Gov't Ex.* 2.

  [10]*Ex. 1*, 16:07:26; During this interim Peoples phoned in a request for an officer "to Mirandize somebody in Spanish" (15:19:23), and once secured, the interpreter proceeded to do so after Peoples handed the phone to Rodriguez-Lopez.

## II.  DISCUSSION

### A.  Detention, search, and seizure incident to traffic stop

Rodriguez Lopez does not dispute the speeding violation which prompted the state trooper's stop of his vehicle and subsequent issuance of a warning citation.  Instead, he attacks the lawfulness of Trooper Peoples' "interrogation on matters unrelated to the basis for the stop", characterizing this interval as an "improper seizure", and contends that his "further questioning and detention ... after [issuance] of the warning ticket expressly contravenes *United States v. Perkins*, 348 F.3d 965 (11th Cir. 2003) and *United States v. Boyce*, 351 F.23d 1102 (11th Cir. 2003)."[11]  Neither contention is correct as applied to this record.

In *Muehler v. Mena*, 125 S.Ct.1465, 1471 (2005), the United States Supreme Court explained that mere police questioning does not constitute "a discrete Fourth Amendment event":

> We have "held repeatedly that mere police questioning does not constitute a seizure." *(citations omitted)* "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *(citations omitted)*.  As the Court of appeals did not hold that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment.  Hence, the officers did not need reasonable suspicion to ask

---

[11]Rodriguez-Lopez maintains that post-warning inquiries amounted to "investigative" questioning  requiring *Miranda* rights not advised prior thereto and thereby invalidating any responsive statements and searches. He contends further that Peoples' warrantless search of the glove compartment infringed Fourth Amendment rights. (*Mot.* at 8-9).  The United States responds that even police questioning unrelated to a traffic stop  does not constitute a seizure so long as it does not prolong the time reasonably required to complete the initial purpose. Moreover, the United States argues,  the totality of the circumstances provided reasonable suspicion of criminal activity sufficient to detain Rodriguez-Lopez reasonably for further questioning. (*Resp.* at 7-8).

Mena for her name, date and place of birth, or immigration status.[12]

The Eleventh Circuit Court of Appeals, in *United States v. Hernandez*, 418 F.3d 1206 (11th Cir. 2005), *pet. for reh'g filed*, No. 04-11776 (Aug. 17, 2005), also recently underscored the impropriety of sharpening the analytical inquiry unduly on the nature of police questioning incident to a traffic stop:

> [A]rguments that the Trooper asked questions unrelated to either officer safety, the speeding offense, or processing the citation are not determinative of our evaluation of the constitutionality of the seizure here. We are to look only at the duration of the seizure given all the circumstances: was it for an unreasonable time? And, of course, a traffic stop will inherently take some time. When an officer is, for instance, looking at a driver's license or waiting for a computer check of registration, he lawfully can at about the same time also ask questions – even questions not strictly related to the traffic stop.

*Id.* at 1209. It is also firmly established that officers may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (*citation omitted*); *see also United States v. Ffriend*, No. 05-11499, 2005 WL 2293462, 2005 U.S. LEXIS 20308, at *2-4 (11th Cir. Sept. 21, 2005).

Informed by these principles, the court readily rejects the contention that while awaiting requested verifications on Rodriguez-Lopez and the car, Trooper Peoples impermissibly asked him "investigative questions" regarding his intended purchase and transport of a truck in Atlanta, his intended disposition of the car being driven, and the nature of his work. With respect to the contention that Peoples infringed his Fourth Amendment rights by a "warrantless search of the glove

---

[12]The search underlying this 42 U.S.C. § 1983 action occurred pursuant to a warrant executed at a residence occupied by, *inter alia*, Mena, who was detained in handcuffs for 2-3 hours while officers searched for weapons and a wanted gang member suspected to reside on the premises; while so detained, Mena was also questioned about her immigration status.

compartment", no evidence casts any doubt on the consent supplied by Rodriguez-Lopez for the trooper's act in searching for barely a minute the glove compartment for insurance documents reportedly inside.

Nor is there merit to the argument that *Perkins* and *Boyce* prohibit Peoples' questioning and detention of Rodriguez-Lopez after issuing him a warning ticket. The determinative analytical query is whether the totality of circumstances supplied Peoples with reasonable suspicion of some criminal involvement by Rodriguez-Lopez. Peoples grounded his suspicion on several factors deemed significant based on "drug interdiction"training and experience acquired over the course of his 16-year career in law enforcement[13]

Peoples noted four of the suspicious factors during his initial encounter with Rodriguez-Lopez: a "Support your Texas Troopers" sticker on the car,[14] multiple cell phones, an energy drink and energy pills, a second-party owner for the car. Regarding the significance of the cell phones*,* Peoples explained:

> . . .[P]eople that are actually trafficking in narcotics or criminal activity will have multiple cell phones. One is their personal cell phone, which has all their friends and stuff in it. The second is what I would consider a business cell phone that the person

---

[13]On direct and cross-examination, Trooper Peoples testified extensively about his training in a number of classes on criminal interdiction generally, drug interdiction on passenger and commercial vehicles, along with survival Spanish. The drug interdiction training informed his search for "criminal indicators" incident to traffic stops such as "the driver's nervousness . . .; third-party rentals; second-person owners; ... implausible stories; disclaimers on the vehicle [like] *Support your Country, Support your Local Police, Support Your Troopers*; . . . origin and destination area; if [the driver] is actually living in the car, [i.e.] ... food containers in the car ...energy drinks... luggage." An "origin" area, he explained, refers to "a source city, such as your southwest border states [including] Atlanta" while "destination" areas" include "Atlanta, the Carolinas, the eastern coast, Eastern Seaboard." (*Tr*. 18-21).

[14]*Tr*. 24.

>that they're working for has given them that will have minimum numbers or no numbers in it that would just be a point of contact. . . . [T]here's certain cell phones that have a GPS tracking ability. And somebody that has the IP address ... an actually track that cell phone on the Internet and keep up with where the cell phone is...[15]

Peoples interpreted the energy drink and energy pills as "a sign that [Rodriguez-Lopez] is driving a long distance and he's not wanting to leave the car . . . people that are trafficking in drugs or any type of criminal activity don't want . . . to take the chance of getting it stolen, so they will stay with the car till they get to the destination that they're supposed to be."[16]

Before getting verification on the driver's license and tag, Peoples factored into the mix of suspicious circumstances (a) the trip by Rodriguez-Lopez from Texas to Atlanta, identified by Peoples as a source city for drugs; (b) his reported destination and purpose in Atlanta, to a friend's house located off a non-existent exit ("there is not an Exit 6 in Georgia on I-20") to buy a pick-up truck; and ( c) Rodriguez-Lopez's restlessness and nervousness in response to the request for insurance proof ("he had a strong visible carotid pulse and his posture was closed . . .he became restless, shifting in his seat. . .").[17] The information related from the customs check – a border crossing by the car just two days earlier – completed the circle of suspicious circumstances which prompted further investigative questions in order to clarify Peoples' reasonable suspicion of criminal activity involving Rodriguez-Lopez and the car. The border crossing had significance, Peoples related from his "training and experience," because "a lot of drugs cross the southwest border from

---

[15]*Tr.* 27-28.

[16]*Tr.* 30.

[17]*Tr.* 32-33.

10

Mexico into the United States."[18]

The totality of circumstances weighed by Peoples sufficiently undergirded his objective reasonable suspicion of other criminal activity involving Rodriguez-Lopez and therefore justified his reasonable detention up to the time - between four and five minutes later – that he consented in writing for the search. *See United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) ("Where ...the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then come to his attention." (internal quotation marks omitted (brackets in original) ).[19] There being no Fourth Amendment illegality in the detention, the seizures resulting from the unchallenged consensual search which followed cannot be excluded as evidence.[20] See *United States v.*

---

[18] *Tr*. 42.

[19] The court in *Harris* found a law enforcement officer "justified in stopping and detaining" a motorist seen swerving into the emergency lane twice, in order "to determine whether he was drunk or falling asleep at the wheel." The officer also noticed that the defendant "(1) [was] driving a rental car with a restricted license; (2) [was] 'shaking' and acting 'extremely nervous'; and (3) gave conflicting responses as to where he had been." The court held that 'under these circumstances, where [the officer] acted on reasonable suspicion and only detained Harris for a short period of time ...[the defendant]'s detention did not violate the Fourth Amendment's prohibition against unreasonable seizures." 928 F.2d at 1117.

[20] The Fourth Amendment claim by Rodriguez-Lopez rests solely on the illegality of his continued detention after being given a warning ticket for speeding, the validity of which is not disputed.
> At the evidentiary hearing, Mr. Rodriguez Lopez will show that after the warning ticket was issued to Mr. Rodriguez-Lopez, Trooper Peoples had no "reasonable suspicion" upon which he could base any further detention. At most, Trooper Peoples had been provided some unclear and possibly inconsistent statements by Mr. Rodriguez-Lopez. However, the Eleventh Circuit has made it clear that this cannot form the basis of continued detention. Because the further detention of Mr. Rodriguez-Lopez was prohibited by the Fourth Amendment, any questioning, answers and consent that stem from the further detention must be suppressed/excluded. *Perkins*, 348 F.3d at 969 (*citing United States v. Terzado-Madruga*, 897 F.3d 1099, 1112 (11th Cir. 1990).

*Mot*. at 10-11.

*Hernandez*, 418 F.3d 1206 (11th Cir. 2005), *pet. for reh'g filed*, No. 04-11776 (Aug. 17, 2005) (finding constitutional a pre-consensual detention of 17 minutes in the context of an indisputably valid traffic stop for interstate highway speeding attended by objective signals of other criminal activity);[21] see also *United States v. Johnson*, No. 04-15258, 2005 U.S. App. LEXIS 11582*10 (11th Cir. June 16, 2005).[22]

---

[21] The suspicious circumstances deemed objectively reasonable in *Hernandez* include some evidenced on this record:

> Defendant was traveling at three o'clock in the morning [from Texas to Atlanta], and the Trooper was able to observe the food containers and small amount of luggage when he first approached the pick-up truck. He testified that he considered the food containers suspicious because people transporting contraband often drive long distances without leaving their vehicles, because they fear leaving the contraband unattended. In fact, the Trooper had received drug interdiction training which instructed that the presence of food containers was a factor that may raise suspicion in a traffic stop situation. . . . . The implausibility that the truck was speeding because Defendant was suffering from diarrhea – after they had just passed a lighted exist with restroom facilities in rural Alabama at 3 a.m. (where rest stops were few and far between) – combined with the Trooper's observation of the food containers and minimal luggage, creates a more suspicious set of circumstances than a mere demonstration of nervousness, use of an out-of-state license, or habit of repeating questions before answering.
>
> By the time the Trooper sought permission to search the truck, at lease these circumstances provided a reasonable officer with a "minimal, particularized basis," Pruitt, 174 F.3d at 1221, for reasonable suspicion: (1) the implausible excuse for speeding; (2) empty food containers in the vehicle; (3) discrepancies in stories about the trip's length and purpose; (4) abnormal nervousness in both detainees; (5) nonstop travel at night in severe weather; (6) lack of knowledge on the trip's destination; (7) travel between two main source cities for narcotics; and (8) minimal luggage.

*Hernandez*, 418 F.3d at 1210-1211.

[22] The court in *Johnson* found "sufficient articulable suspicion of illegal activity" for a sheriff's deputy to detain for a short time a truck driver observed crossing the interstate center lines several times. Three articulated facts created the suspicion warranting the deputy's brief detention of Johnson before securing consent to search his truck: (1) Johnson's account of his last stop

12

B.      **Racial Profiling Claim**

For his claimed violation of constitutional rights secured by the Fourteenth Amendment's Equal Protection Clause, Rodriguez-Lopez contends that Trooper Peoples "possesses a racial bias against individuals of Hispanic or Latino origin"...he engages in a "practice of requesting consent to search forms from Hispanic and Latino drivers at a rate that is 26 times greater than their representative population in Alabama" which demonstrates both a "discriminatory effect on a protected class (individuals of Hispanic or Latino origin)" and "discriminatory intent"[23]

The contention fails solely for lack of relevant, credible evidentiary support. The record is clear that Peoples could not even ascertain the race or ethnicity, gender, or number of occupants in the car until he approached Rodriguez-Lopez at his passenger's window.[24] The court expressly found Peoples to be a credible witness with respect to this fact.[25] Notwithstanding a valiant effort, the Defendant could present no credible statistical evidence for expert analysis in support of his contention that Trooper Peoples requests consensual searches from Hispanic drivers in a manner

---

differed from the notation in his logbook; (2) the curtains to the sleeper cab were drawn which was unusual for a truck driver driving alone; and (3) Johnson was "extremely nervous; when asked whether he had illegal drugs in the truck."

[23] *Mot.* at 7.

[24] *Tr.* 24-24, 44-46. Defendant did attempt, creatively albeit unsuccessfully, to refute Peoples' claim with testimony, photographs, and a videotape involving a purportedly simulated positioning of the Crown Victoria to establish that Peoples should have had visibility inside the car's tinted windows before actually stopping the car. *See Tr.* 50-58; 127-144; *Def.'s Exs*. 2A-2C.

[25] *Tr.* 189-190.

13

evidencing a discriminatory effect and intent.[26]  Indeed, defense counsel conceded his inability to establish the "discriminatory intent" which is a necessary element of the claim for racial profiling.[27]  *See United States v. Armstrong,* 517 U.S. 456 (1996) (discussing necessary proof for claim

---

[26] At the conclusion of the evidentiary hearing the court granted a motion by the United States (Doc. 43, Sept. 6, 2005) to exclude as untimely expert reports, statistical reports, or documentary exhibits presented in support of the defendant's racial profiling claim.  In response to the court's announcement that the motion would be granted "to the extent of excluding the entire issue of racial profiling with reference to whether evidence will be produced", Defendant argued that the court prejudiced the claim by insisting that counsel make a proffer of the evidence  – after having discharged all experts – in lieu of setting a supplemental hearing for the defense expert to make the proffer.  Though the court expressed its "view that counsel...stated with sufficient clarity the evidentiary proffer," the court accepted into evidence the expert report (Def's Ex. 8) to be "considered as clarification or supplementation of the proffer made by defense counsel on what his expert would show." *Tr.* 193-194.  This court's conclusion takes into consideration that report.  As announced at the conclusion of the hearing, the court found "significant deficiencies in the underlying data to support any expert opinions." *Tr.* 191.

[27] *See Tr.* 145-182.  The court's pointed colloquy with defense counsel is relevant:

> The Court:   I have a full understanding of your claim and your views with reference to the evidence.  I want to shift grounds just slightly here.  We've been talking evidence; now I want to talk law. . . .[L]et me ask you for the record to state the burden of proof a movant has when asserting a claim of selective profiling as you have; that is, selective profiling based on race.
>
> Mr. Butler:  Discriminatory effect and discriminatory intent.  I have to show both of these.
>
> The Court:   All right.  Now, tell the Court ..what evidence you believe is already in the record on the question of discriminatory intent.
>
> Mr. Butler:  The only evidence that I could show as to that issue, because it's an – is the stop of Mr. Rodriguez.  My point is there is no evidence on the record of racial animus, for instance, on the part of Trooper Peoples; but as case law has indicated, that would always be – almost be impossible to find.  I have attempted, Your Honor, to obtain information relating to the training.  It is our position, Your Honor, that officers are

premised on selective enforcement claim – analytically applicable here– including claimant's duty to demonstrate, by clear evidence, discriminatory effect and discriminatory purpose); *see also United States v. Smith*, 231 F. 3d 800 (11th Cir. 2000).

### III.  CONCLUSION

Accordingly, pursuant to the stated findings of fact and legal analysis, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's *Motion To Suppress Stop, Searches and Seizures* (Doc. 23) be **DENIED.**

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than **November 21, 2005**.  Any objections filed must specifically identify the findings in

---

|  |  |
|---|---|
|  | being trained to profile . . And then they are getting around their profiling conduct by then saying, well. I've been trained.. . . |
| *** |  |
| The Court: | . . . Now, let me ask you if there is any specific evidence of discriminatory intent to profile attributable to Trooper Peoples that is either in the record thus far or that you can put in the record if given an opportunity to do so? |
| *** |  |
| Mr. Butler: | Again, based on evidence there is in the record, there is nothing that I can – discriminatory intent, that's a tough one. . . |
| The Court: | Even though it's a tough one, do you agree that it is a burden you must carry? |
| Mr. Butler: | Yes, Your Honor.  And there is – *** it's not my recollection that he made any – there was any testimony that he directly discriminated. |

*Tr.* 183-186.

the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*)(adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 9th day of November, 2005.

**/s/ Delores R. Boyd**
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE